UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| JAMES DOUGLAS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | Civil No. 10-26-ART |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| UNITED STATES OF AMERICA, | ) | **& ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

"You do not have lung cancer." Usually, this would be great news. Unfortunately for the plaintiff, James Douglas, he did not receive this news until two weeks after doctors at the Veterans Administration Medical Center had removed his left lung. Douglas filed suit against the United States under the Federal Tort Claims Act alleging medical malpractice. Because Douglas has submitted competent expert testimony establishing that the lung-removal surgery caused him injury, the United States' motion for summary judgment is denied.

### BACKGROUND

James Douglas is fifty years old. He is also a veteran. He enlisted in the Army National Guard in 1980 and continued to serve until 1991, when he volunteered for active combat in Kuwait. Douglas's mission in Kuwait ended after just three-and-a-half months when he was injured in a truck accident. The accident aggravated herniated discs in Douglas's neck and lower back, causing him to leave the National Guard in 1993. R. 40-1 at 7-9.

In December 2007, Douglas began experiencing occasional chest pain as well as numbness and pain in his legs when walking short distances. He went to the Veterans Administration ("VA") Medical Center in Lexington, Kentucky, for a checkup. A CT scan revealed two masses in Douglas's left lung, one 3.9 centimeters in diameter, the other 2.3 centimeters in diameter. Doctors speculated that the masses could be cancerous, although they were not sure. Two days later, doctors performed a biopsy of the smaller mass. The biopsy was inconclusive. Doctors did not perform a biopsy of the larger mass because of its proximity to Douglas's pulmonary artery—there was a danger that the biopsy needle would puncture the artery, causing serious damage.

Doctors performed further tests seeking to determine the cause of the masses and whether they were cancerous. Tests of Douglas's blood, urine, and tissue failed to detect possible fungal, viral, or bacterial causes for the masses, still leaving cancer on the table as a possibility. And a PET scan performed in February 2008 revealed areas of hypermetabolism near the masses, a result consistent with cancer. Based on these tests, his prior medical history, and his long history of smoking cigarettes, Douglas's treating physician at the VA, Dr. Ferraris, believed that Douglas probably had lung cancer. He recommended surgery to remove the lower lobe of Douglas's left lung (a "lower left lobectomy").

The surgery took place on February 21, 2008. Dr. Ferraris performed the surgery, along with Dr. Ruzic. After they had sedated Douglas and opened up his chest cavity, the surgeons observed dense lesions covering Douglas's left lung. They also observed that one of the masses had spread from the lower left lobe and extended across the fissure of the lung into the upper left lobe. The surgeons again performed a biopsy of the smaller mass, which

was negative for cancer. But, again, they did not biopsy the larger mass—the one that now extended into the upper lobe—because of its proximity to the pulmonary artery. Rather than leave the mass in his lung, the surgeons decided to remove Douglas's entire left lung (a "pneumonectomy"). After they did so, they closed Douglas's chest cavity, stitched him up, and sent his left lung to the pathology department for further tests.

Douglas recovered from the surgery at the VA Medical Center for seven days and was discharged on February 28, 2008. Two weeks later, the pathology department determined that the masses in Douglas's left lung were not cancerous, but rather were "caseating granulomas." The cause of the granulomas is still unknown. Doctors told Douglas that the masses were not cancerous when he returned to the VA for a follow-up appointment on March 11, 2008. He subsequently sought treatment from other VA medical centers, including one in Mountain Home, Tennessee, as well as private medical providers.

On January 22, 2010, Douglas filed a complaint against the United States under the Federal Tort Claims Act ("FTCA") alleging medical malpractice. R. 1. He subsequently filed an amended complaint, R. 4, and a second amended complaint, R. 17. After the close of discovery on April 1, 2011, the United States filed two motions: (1) a motion for summary judgment and to exclude the testimony of Douglas's expert witnesses under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), R. 45, and (2) a motion to exclude proposed expert testimony from Douglas's treating physicians for failure to comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a), R. 44. Douglas filed a response in opposition to the United States'

first motion, R. 48, to which the United States replied, R. 49. Douglas did not file a response to the second motion.

## DISCUSSION

Because he brings his claims under the FTCA, Douglas must establish that "the United States, if a private person, would be liable to [him] in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The surgery took place in Kentucky. Thus, Douglas must make out a negligence case under Kentucky law, *see Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996), which requires duty, breach, causation, and damages. *Boland-Maloney Lumber Co. v. Burnett*, 302 S.W.3d 680, 686 (Ky. Ct. App. 2009). To avoid summary judgment, Douglas must submit sufficient evidence to raise a material question as to each of these elements. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). The United States concedes that Douglas has raised material questions as to the first two elements—duty and breach. R. 49 at 2 ("The United States acknowledges a dispute of material fact regarding the alleged breach of the standard of care . . . ."). But it argues that Douglas has failed to establish the causation element because (1) he has not produced reliable expert testimony establishing that the pneumonectomy caused his injury, as required by Kentucky law, and (2) even if his experts' opinions are reliable, they do not establish that the pneumonectomy was a probable, as opposed to merely a possible, cause of Douglas's injuries. The United States is not entitled to summary judgment on either ground.

### 1. What is the Injury?

First thing's first. The parties disagree on a basic question—what, exactly, is the injury that Douglas has suffered? As Douglas sees it, his primary injury is the loss of the

lung itself. This injury, in turn, has produced additional medical complications, including "shortness of breath," "chronic respiratory failure," "decreased exercise tolerance and ability to work," and the potential for "postneumonectomy syndrome" and "esophageal functional abnormality." R. 45-7; R. 45-9. The United States sees things differently. It believes that the loss of Douglas's lung cannot be his injury because it is also the alleged breach, and the injury and breach elements of a negligence case may not be conflated. Instead, the United States argues that Douglas must establish that the removal of his lung (the breach) caused some other complication beyond the mere loss of the lung, such as chronic respiratory failure (the injury).

Although the United States is correct that breach and causation are distinct elements, it does not follow that the loss of Douglas's lung is not an injury. The United States does not provide any legal support for its argument that because "loss or removal of Plaintiff's lung is the breach of the standard of care, loss or removal of the lung cannot also be the injury." R. 49. This dearth of support is not surprising, because the argument makes little sense. First of all, the United States' argument conflates the *removal* of Douglas's lung (the breach) with the *loss* of that lung (the injury). Douglas is not claiming that the exact same thing fulfills both the breach and the injury elements. Rather, he alleges that an act (removal of the lung) caused a physical state of being (loss of the lung). It is hardly controversial that the loss of a body part can be a cognizable injury. *See, e.g.*, *Bowman v. Kalm*, 179 P.3d 754, 756-57 (Utah 2008) (describing the "mistaken[] amputat[ion of] the wrong leg" as an "injur[y]"); *Calalpa v. Dae Ryung Co.,* 814 A.2d 1130, 1132 (N.J. Super. Ct. App. Div. 2003) (describing "three amputated fingers" as an "injury").

5

The United States' argument that Douglas must prove that the loss of his lung caused additional complications confuses the *existence* of an injury with the *extent* of that injury. Imagine the following case: A patient goes into the hospital to have his tonsils taken out. When he wakes up, he discovers that the doctors have mistakenly amputated his right leg. The breach (removal of the leg) and the injury (loss of the leg) would surely be enough to sustain a negligence action against the hospital. Under the United States' line of reasoning, however, the plaintiff would have to show some *additional* complications from the loss of his leg, such as reduced mobility or phantom limb syndrome, to satisfy the injury element. Again, this confuses the existence of an injury with the amount of damages that the injury has caused. Not all body parts are created equal, and the loss of some will cause more disruptions and problems—and, hence, yield more damages—than the loss of others. That is why a plaintiff who loses an arm will receive more money than a plaintiff who loses a finger. Thus, the additional complications caused by the loss of Douglas's lung, such as respiratory failure and reduced exercise tolerance, will determine the *extent* of his injury and the amount of damages to which he is entitled. But they are not necessary to establishing the existence of an injury in the first place. The loss of Douglas's lung checks that box.

Not to be deterred, the United States argues that even if the loss of his lung is an injury, Douglas still comes up short because he has not provided expert testimony establishing that the pneumonectomy caused the loss of his lung. R. 49 at 11. This argument does not pass the laugh test. Although in Kentucky a plaintiff in a medical negligence case generally must produce expert testimony establishing that the alleged breach proximately caused his injury, *see Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006), this

requirement does not apply where causation is "so apparent that a layman with general knowledge would have no difficulty recognizing it." *Morris v. Hoffman*, 551 S.W.2d 8, 9 (Ky. Ct. App. 1977). It does not take four years of medical school to know that lung-removal surgery causes the loss of a lung. Therefore, although neither of Douglas's experts explicitly stated that the pneumonectomy caused Douglas to lose his left lung, there is still sufficient evidence from which a reasonable fact finder could find in his favor on the causation element.

### 2. Expert Testimony as to Additional Complications

But even if the United States is correct that the loss of Douglas's lung cannot be his injury, summary judgment still would not be appropriate because Douglas has submitted competent expert testimony establishing that the pneumonectomy caused additional complications. Because this is a medical negligence case, Kentucky law requires Douglas to establish causation with expert testimony. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000). Douglas has submitted the opinions of two expert witnesses—Dr. Mark Ferguson of the University of Chicago Medical Center, R. 45-9, and Dr. Hon Chi Suen of the Center for Cardiothoracic Surgery in St. Louis, Missouri, R. 45-7. Both Dr. Ferguson and Dr. Suen have testified that the pneumonectomy caused Douglas additional medical complications.

Dr. Ferguson states that, because of the pneumonectomy, Douglas "is affected by shortness of breath that prevents him from participating in sporting activities with his son or walking with his wife, [he] has to use inhalers to help his breathing, and [he] is bothered by chronic incisional pain." R. 45-9 at 2. The United States does not challenge the reliability of

7

the first part of Dr. Ferguson's opinion—that the pneumonectomy caused Douglas to suffer from shortness of breath that restricts his daily activities. *See* R. 45-1 at 28 (asking the Court to exclude only Dr. Ferguson's opinion that the pneumonectomy caused Douglas "chronic incisional pain"). Thus, the record contains one unchallenged expert opinion that the pneumonectomy caused Douglas an injury beyond the removal of the lung itself. This, on its own, is enough to preclude summary judgment.

Like Dr. Ferguson, Dr. Suen also opined that the pneumonectomy caused Douglas to suffer from "[c]hronic respiratory failure resulting in decreased exercise tolerance and inability to work." R. 45-7 at 2. The United States argues that Dr. Suen's opinion must be excluded under Federal Rule of Evidence 702 and *Daubert* because it is unreliable. Under Rule 702, a court should only admit relevant expert testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Rule 702 gives district courts a "'gatekeeping role' in screening the reliability of expert testimony." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010) (quoting *Daubert*, 509 U.S. at 597). The United States argues that Dr. Suen's opinion fails the first prong of Rule 702's reliability test because it is not based on sufficient facts or data. In the face of such a challenge, the Court's role is to ensure that the expert's testimony "rests on a reliable foundation," *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (internal citation and quotation marks omitted), and is based on more than the mere "*ipse dixit* of the expert." *Tamraz*, 620 F.3d at 671 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

8

Dr. Suen's opinion that the pneumonectomy caused Douglas to suffer from "chronic respiratory failure resulting in decreased exercise tolerance and inability to work" is based on a sufficient foundation. As Dr. Suen stated in his written report, R. 45-7 at 1, and during his deposition, Deposition of Dr. Hon Chi Suen ("Dr. Suen Depo."), R. 38-2, at 31-32, in forming his opinion he reviewed Douglas's medical records from the VA Medical Centers in Lexington (where the surgery was performed) and Mountain Home (where Douglas received some post-operative care). When asked during his deposition to identify the specific records from which he concluded that Douglas suffered from chronic respiratory failure and decreased exercise tolerance, Dr. Suen said, "I think I remember somewhere [Douglas] said that he was short of breath." *Id*. at 105. True, Dr. Suen was not able to specifically pinpoint these records during the deposition. But the United States has directed the Court to no authority establishing that an expert must specifically pinpoint the records on which he relied in order for his opinion to satisfy *Daubert*'s reliability requirement.

Dr. Suen also said that he based his assessment on post-surgery pulmonary function tests. *Id*. at 121-22. The United States argues that these tests are not an accurate basis from which to discern Douglas's current respiratory capacity because they were performed more than two years ago, immediately after the surgery. But the United States' argument that this fact renders Dr. Suen's testimony unreliable fundamentally "confuses the *credibility and accuracy* of [Dr. Suen's] opinion with its *reliability*." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). The United States does not contend (nor could it) that Dr. Suen pulled his diagnosis "out of thin air." *Id*. at 531. Dr. Suen plainly stated that he based his opinion on items in Douglas's medical record, including the pulmonary function tests.

9

Rather, the United States' beef is with the accuracy of the records Dr. Suen relied on. But "mere weaknesses in the factual basis of an expert witness's opinion bear on the *weight* of the evidence rather than on its *admissibility*." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (citation, quotation marks, and alteration omitted; emphasis added). In *Scrap Metal*, for example, the defendants challenged the reliability of the plaintiffs' expert witness, who offered an opinion as to the monetary damages caused by the defendants' anticompetitive conduct. 527 F.3d at 524. The defendants argued that the expert used inaccurate price data. *Id.* at 531. The Sixth Circuit held that the expert's testimony had been properly admitted because the questionable accuracy of the price data went "to the weight of the evidence, not to its admissibility." *Id.* Similarly here, the United States takes issue with the accuracy of the pulmonary function tests on which Dr. Suen relied. Although those tests—from two years ago—may not accurately depict Douglas's current pulmonary function, this is an argument that goes to the weight of Dr. Suen's opinion, not to its reliability. It is therefore not an appropriate reason for excluding the opinion as unreliable. *See id.* at 529.

The United States also assails the reliability of Dr. Suen's opinion because he did not adequately take into account other possible causes of Douglas's respiratory problems, including his obesity, chronic back and leg pain, and long history of smoking (which he continued even after the lung-removal surgery). During his deposition, Dr. Suen acknowledged that all of these things could cause respiratory problems. And when asked whether he was "able to conclude to a reasonable degree of medical certainty what percentage" of Douglas's respiratory problems were attributable solely to the

pneumonectomy, Dr. Suen said: "I think it's impossible to pinpoint a percentage." Dr. Suen Depo. at 131. Dr. Suen's inability to nail down the specific percentage of Douglas's respiratory problems that are attributable to the pneumonectomy does not render his opinion unreliable. "In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000). *Daubert* requires only that the expert's testimony "be derived from inferences based on a scientific method" and have a foundation in "the facts of the case." *Id.* It does not demand that the expert "*know* answers to all the questions a case presents." *Id.* Therefore, the reliability of Dr. Suen's conclusion that the pneumonectomy caused some part of Douglas's respiratory problems is not undermined by his inability to pinpoint exactly how much was caused by the lung-removal surgery and how much was caused by other factors. *See id.* For all of these reasons, the Court will not exclude as unreliable Dr. Suen's opinion that the pneumonectomy caused Douglas to suffer from "chronic respiratory failure resulting in decreased exercise tolerance and inability to work."

Douglas's experts also testified that the pneumonectomy caused other medical complications beyond decreased respiratory function and shortness of breath. According to Dr. Suen, Douglas now suffers from "[i]nability to withstand future lung surgery," "[p]otential[] . . . postneumonectomy syndrome in the future," and "potential esophageal functional abnormality." R. 45-7. And Dr. Ferguson says that the pneumonectomy has caused Douglas "chronic incisional pain." R. 45-9. The United States attacks the reliability of all of these conclusions. The Court need not resolve the United States' objections at this stage of the proceedings, however, for two reasons.

11

First, this will be a bench trial. *See* 28 U.S.C. § 2402; *Harris v. United States*, 422 F.3d 322, 327 (6th Cir. 2005). Thus, there is no jury to be protected "from being bamboozled by technical evidence of dubious merit." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003) (Posner, J., sitting by designation); *see Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 851 (6th Cir. 2004) (under *Daubert* "district courts must act as 'gatekeepers' *to protect juries* from misleading or unreliable expert testimony") (emphasis added). Although the Court is no Mr. Wizard or Bill Nye ("The Science Guy"), its ability to assess the reliability of expert testimony during trial is somewhat better than that of twelve lay jurors. Thus, although all of Douglas's experts must pass *Daubert* scrutiny before the Court may rely on their testimony to find in Douglas's favor, the "usual concerns" about shielding the jury from unreliable expert testimony "obviously do not arise" in a bench trial. *Atty. Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009).

Second, this is just the summary judgment stage of the case. As the First Circuit has cautioned, "the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage." *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). That is because "[a] trial setting normally will provide the best operating environment for the . . . complex factual inquiry required by *Daubert*." *Id*. Thus, "in all but the most clear cut cases," it will be difficult for a court to adequately gauge the reliability of an expert's testimony based on the "truncated record" that is present at the summary judgment stage. *Id.* The Sixth Circuit feels the same way. *See Jahn v. Equine Servs.*, 233 F.3d 382, 393 (6th Cir. 2000) ("A district court should not make a *Daubert* ruling

prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance."). As set forth above, Douglas survives summary judgment on two alternative grounds—(1) the loss of his left lung constitutes an injury for which no expert testimony is needed to prove causation, and (2) he has produced competent expert testimony demonstrating that the pneumonectomy caused him at least one additional injury, namely shortness of breath. Therefore, Douglas's case will advance to trial. Given that, the more prudent course is to defer ruling on the admissibility of the rest of the experts' opinions until the Court has the opportunity to hear their testimony live and in-person during trial. That will be the best way to evaluate the reliability of their opinions. The Court could, of course, hold a *Daubert* hearing before trial. But that would be an unnecessary waste of the parties' resources. The Court will be able to evaluate the experts' testimony during the trial itself, so making the experts and the parties' lawyers travel to London, Kentucky, for a hearing beforehand would serve little purpose. Thus, because there is no jury to protect from unreliable testimony, it makes more sense for the Court to exercise the "substantial flexibility" it enjoys in the timing of its *Daubert* analysis and evaluate the experts' testimony as to Douglas's other injuries during the course of the trial itself. *Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 635 (6th Cir. 2000) (Gilman, J., dissenting).

3.  **Probable vs. Possible Cause**

In a last-ditch attempt to win summary judgment, the United States argues that the opinions of Dr. Suen and Dr. Ferguson are not sufficient to avoid summary judgment under Kentucky law because they do not establish causation with the required degree of certainty.

13

Invoking *Walden v. Jones*, 439 S.W.2d 571 (Ky. 1968)—in which the Kentucky Supreme Court said that expert testimony in a medical negligence case must establish that "causation is probable and not merely possible," *id.* at 574 (citation omitted)—the United States contends that the testimony of Douglas's experts establishes, at best, that the pneumonectomy was merely a *possible*, but not a *probable*, cause of Douglas's respiratory problems. That is so, the argument continues, because neither Dr. Ferguson nor Dr. Suen could pinpoint with certainty the percentage of Douglas's respiratory difficulties attributable to the pneumonectomy and the percentage attributable to other factors, such as Douglas's obesity and smoking habit. This argument fails for two reasons.

First, the argument only gets off the ground if the loss of Douglas's lung is not itself considered an injury. No one can seriously contend that the lung-removal surgery was not a probable cause of the loss of Douglas's left lung. As explained above, the better view is that the loss of Douglas's lung *is* appropriately considered an injury.

But even if Douglas must show that the loss of his lung caused other complications, such as chronic shortness of breath, his experts' opinions adequately establish a probable—as opposed to merely a possible—causal connection. True, both Dr. Suen and Dr. Ferguson acknowledge that other factors, including Douglas's obesity, his smoking habit, and his chronic back and leg pain, could contribute to his respiratory problems and his decreased exercise tolerance. And, true, neither Dr. Suen nor Dr. Ferguson could specifically pinpoint the percentage of Douglas's respiratory problems attributable to the pneumonectomy and the percentage attributable to other factors. But the United States' argument that these two facts mean that the experts have only identified the pneumonectomy as a "possible," rather than a

14

"probable," cause of Douglas's injury rests on little more than labels. The United States cites to no authority for the proposition that an expert's testimony as to causation is insufficiently certain if he acknowledges other contributing factors and is unable to apportion causation among those causes with certainty. And the rule would make little sense. Medical maladies often have more than one cause: lung cancer may be caused by smoking, air pollution, and exposure to asbestos; a heart attack may be the result of genetics, poor diet, and a sedentary lifestyle. Just because an expert may not be able to specifically apportion causation among various factors does not mean that his opinion slips from the admissible realm of probable to the inadmissible realm of merely possible.

The possible-versus-probable test is meant to exclude expert testimony like that in *Kelly Contracting Co. v. Robinson*, 377 S.W.2d 892 (Ky. 1964). The issue in that case was whether an employee's heart attack was caused by his exertion at work. An expert, admitting that his opinion was based on "speculation," opined that the employee's exertion "could have been a factor" in his heart attack. *Id.* at 893. The Kentucky Supreme Court held that this testimony was not sufficient to establish causation because it only established that the employee's exertion was a possible, but not a probable, cause of his death. *Id.* at 894. Here, in contrast, Dr. Suen's and Dr. Ferguson's opinions offer much more certainty. Dr. Suen stated that "*[b]ecause of* the unnecessary left pnuemonectomy, [Douglas] suffers from . . . [c]hronic respiratory failure." R. 45-7 (emphasis added). And Dr. Ferguson stated that Douglas suffered from shortness of breath "*[a]s a result of* [the] unnecessary left pneumonectomy." R. 45-9 (emphasis added). "Because of" and "as a result of" offer much

more certainty than the expert's opinion that was deemed insufficient in *Kelly Contracting*, which used words like "speculation" and "could have been a factor." 377 S.W.2d at 893.

Therefore, because Douglas's experts establish that the pnuemonectomy was a probable cause of his injuries, including chronic shortness of breath and respiratory difficulties, their testimony is sufficient to avoid summary judgment.

> **4. The United States' Motion to Exclude Expert Testimony of Douglas's Treating Physicians**

The United States also filed a motion asking to the Court to exclude proposed expert testimony from Douglas's treating physicians. R. 44. The United States argues that the testimony should be excluded because (1) beyond Drs. Abdi Vaezy and Uyi Idemudia, Douglas did not identify any of his treating physicians with specificity, as required by Federal Rule of Civil Procedure 26(a)(2), and (2) Douglas did not submit written reports from any of his treating physicians, as required by Rule 26(a)(2)(B). Thus, the United States contends that Douglas should be barred from introducing expert testimony from his treating physicians under Rule 37(c).

This motion will be granted. First, Douglas did not file a response. That alone is sufficient grounds to grant the motion. *See* Local Rule 7.1(c) ("Failure to timely respond to a motion may be grounds for granting the motion."). Second, Douglas's disclosure of his treating physicians was inadequate. Beyond Drs. Vaezy and Idemudia, Douglas did not specifically identify any of the treating physicians he intends to call as expert witnesses. Instead, he simply said that the treating physicians he might call "include those listed in the Defendants' [Rule] 26(a)(1) disclosures," R. 44-3 at 2—a total of thirty physicians. Rule 26(a)(2)(A)'s requirement that a party disclose "the identity of any witness it may use at trial

to present" expert testimony demands more than simply pointing to a laundry list of physicians identified by the other party. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 (7th Cir. 2004) ("[A party] should not be made to assume that each witness disclosed . . . could be an expert witness at trial."). And third, although Douglas did specifically identify Drs. Vaezy and Idemudia, he did not provide a written report from either. Fed. R. Civ. P. 26(a)(2)(B). Accordingly, although Drs. Vaezy and Idemudia may testify as fact witnesses about their treatment of Douglas, they may not offer expert testimony as to matters beyond that treatment. *See Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 811 (6th Cir. 2005). Therefore, Douglas's failure to satisfy Rule 26(a)(2)'s disclosure requirements triggers Rule 37(c)'s exclusion sanction. Douglas may not introduce expert testimony from any of his treating physicians.

## CONCLUSION

For these reasons, it is **ORDERED** as follows:

(1) The United States' motion to exclude the expert testimony of Dr. Hon Chi Suen and Dr. Mark Ferguson, R. 45, is **DENIED WITHOUT PREJUDICE**. The United States' motion for summary judgment, R. 45, is **DENIED**.

(2) The United States' motion to exclude the expert testimony of his treating physicians, R. 44, is **GRANTED**.

This the 5th day of July, 2011.



Signed By:
*Amul R. Thapar* AT
United States District Judge